

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **SHUTTLEWAGON, INC.,** | ) | |
| | ) | |
| **Appellant,** | ) | **WD83882** |
| | ) | |
| **v.** | ) | **OPINION FILED:  June 22, 2021** |
| | ) | |
| **SCOTT HIGGINS, ET AL.,** | ) | |
| | ) | |
| **Respondents.** | ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Kevin D. Harrell, Judge

Before Division Four:  Cynthia L. Martin, Chief Judge, Presiding, Lisa White Hardwick,
Judge and Thomas N. Chapman, Judge

Shuttlewagon, Inc. ("Shuttlewagon") appeals from a judgment entered in favor of

Donald Crist ("Crist"), Emily Coon ("Coon"), Scott Higgins ("Higgins"), John Ying

("Ying"), and Innovative Quality Solutions, LLC ("IQS"), on Shuttlewagon's claims of

unfair competition, computer tampering, and conspiracy to commit computer tampering.

Shuttlewagon argues that the trial court erred in denying a motion for sanctions against

IQS and its counsel, in admitting evidence which was not legally relevant and confused

the jury, and in instructing the jury on the affirmative defense of mitigation of damages. Finding no error, we affirm.

## Factual and Procedural Background[1]

Shuttlewagon designs and manufactures railcar movers, which are large pieces of machinery that move railcars on train tracks. Ying owned Shuttlewagon until 2008, when he sold the company to Nordco, Inc. ("Nordco"). In March 2017, Ying founded IQS, a new railcar mover engineering company. Ying hired several employees who had previously worked for Shuttlewagon, including Crist, Coon, and Higgins (collectively "Employee Defendants"). Employee Defendants were hired by IQS to design and develop a new railcar mover, called the "BOSS."

All of the Employee Defendants formerly worked in Shuttlewagon's engineering department. Crist was employed at Shuttlewagon, or one of its predecessors, from 1972 until January 2013, when he retired. Crist continued to perform contract work for Shuttlewagon until May 20, 2016. Higgins worked at Shuttlewagon from February 13, 1995 until March 3, 2017. Coon worked at Shuttlewagon from July 2014 until March 3, 2017. Higgins and Coon both terminated their employment on March 3, 2017, in order to go to work at IQS. All of the Employee Defendants began working at IQS on, or around, March 20, 2017.

Shuttlewagon utilized a cloud-based database, CallTrak, to store corporate information including engineering drawings and designs. CallTrak was password

---

[1]"On appeal in a jury-tried case, we review the evidence and reasonable inferences therefrom in a light most favorable to the jury's verdict, disregarding evidence to the contrary." *Brummett v. Burberry Ltd.*, 597 S.W.3d 295, 299 n.1 (Mo. App. W.D. 2019) (quoting *Jones v. City of Kansas City*, 569 S.W.3d 42, 47 n.2 (Mo. App. W.D. 2019)).

2

protected and certain employees were given access to the database. Employees could also log onto Shuttlewagon's computer system remotely with virtual private network credentials.

After their employment or contract work terms ended, Crist, Higgins, and Coon logged onto CallTrak or into Shuttlewagon's computer system using their credentials, which had not been revoked. It is not clear from the record how frequently this occurred. However, there was evidence that Higgins successfully logged in on March 6, 2017; that Crist successfully logged in on September 14, 2016; and that Coon used her login credentials to access CallTrak at least once.

In the weeks before Coon's departure from Shuttlewagon, she took photos of information found on Shuttlewagon's software programs. She transferred some of the information from those photos onto IQS's computer system. While working at IQS, Crist possessed an external hard drive which contained thousands of Shuttlewagon's files from its engineering, sales, and operations databases. He acknowledged that the drive contained confidential drawings, and that he accessed the files while working at IQS. Higgins also had an external drive that he accessed while working at IQS, and which contained engineering, sales, and operations information from Shuttlewagon, some of which he knew Shuttlewagon considered to be confidential and proprietary.

On March 26, 2018, Shuttlewagon filed suit against the Employee Defendants for computer tampering, violations of the Missouri Uniform Trade Secrets Act ("MUTSA"),[2]

---

[2]Sections 417.450 to 417.467. All statutory references are to RSMo 2016 as supplemented unless otherwise indicated.

3

and civil conspiracy. After the Employee Defendants were served, Higgins and Crist deleted Shuttlewagon files from their personal computers. In addition, Higgins threw his external device away and Crist lost his external device.

On December 12, 2018, Shuttlewagon filed an amended petition which added Ying and IQS (collectively "IQS Defendants") as defendants. The amended petition asserted the following claims: computer tampering[3] against the Employee Defendants (Count I); violations of the MUTSA against all defendants (Count II); civil conspiracy to commit computer tampering and to violate the MUTSA against all defendants (Count III); unfair competition against all defendants (Count IV); tortious interference with a business expectancy against all defendants (Count V); unjust enrichment against IQS (Count VI); breach of the duty of loyalty against Coon and Higgins (Count VII); breach of restrictive covenant against Crist (Count VIII); and tortious interference with a contract against IQS Defendants (Count IX). IQS Defendants asserted a counterclaim against Shuttlewagon for trespassing, tortious interference, and slander.

On March 27, 2019, based on an agreement of the parties, the trial court issued a protective order to facilitate discovery. The protective order permitted materials produced during discovery to be designated by counsel as "Confidential Information" or

---

[3]Shuttlewagon characterizes its "computer tampering" claim as a claim for violation of the Missouri Computer Tampering Act. Shuttlewagon includes no citation in its appellate brief to any such Act. Section 537.525 (which is referenced in Shuttlewagon's amended petition, but not cited in Shuttlewagon's appellate brief) does authorize a civil action to recover compensatory damages and attorney's fees if a *criminal* violation of section 569.095 to section 569.099 is established. However, section 537.525 is not codified as the Missouri Computer Tampering Act. Most Missouri cases refer to section 537.525 and/or to the referenced criminal statutes at section 569.095 to section 569.099 as "computer tampering statutes." *See, e.g.*, *Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 20-21 (Mo. banc 2012) (referring to section 537.525.1 as permitting a civil "computer tampering claim" against persons who violate the referenced criminal statutes). Because section 537.525 is not codified as the Missouri Computer Tampering Act, we refer to Shuttlewagon's claim that purports to assert a violation of that Act as a computer tampering claim.

"Attorneys' Eyes Only Information" ("AEO"). The section of the protective ordering addressing Confidential Information provided:

> As used in this Order, "Confidential Information" is defined as information that the producing party designates in good faith has been previously maintained in a confidential manner and should be protected from disclosure and use outside the litigation because its disclosure and use is restricted by statute or could potentially cause harm to the interests of disclosing party or nonparties. For purposes of this Order, the parties will limit their designation of "Confidential Information" to the following categories of information or documents: personnel files, financial statements and records, proprietary business records, and trade secrets. Information or documents that are available to the public may not be designated as Confidential Information.

Confidential Information could be permissibly reviewed by parties to the litigation, their counsel, the trial court and its personnel, mediators, and witnesses, but only upon completion of an agreement not to disclose the contents.

> The section of the protective order addressing AEO provided:

> As used in this Order, "Attorneys Eyes' Only" information is defined as Documents that contain or refer to trade secrets, proprietary or business information or other confidential research, including, without limitation, pricing strategies, product formulas, product design, research, development, and manufacturing information, current and prospective customer lists, business plans, budgets, forecasts, competitive market analyses, financial information, technical information, design specifications, or intellectual property, and that if disclosed to a business competitor, including to the Parties or the general public, may cause injury to the disclosing entity's competitive position.

Documents designated AEO could only be reviewed by the parties' attorneys, the trial court and its personnel, and "any *independent* expert witness" who has never been "*an employee, owner, member, director, or officer of either [IQS], [Shuttlewagon], or [Nordco],* or any of their respective subsidiaries or affiliated companies . . ." and "*does*

5

*not own, and has never owned, shares or options related to either [IQS],* *[Shuttlewagon], or [Nordco]* . . . ." (Emphasis added.) AEO documents could not be reviewed by parties to the litigation.

The protective order provided: "By marking a designated document as confidential or [AEO], *the designating attorney* thereby certifies his/her good faith belief that the document contains Confidential Information or [AEO] Information as defined in this Order." (Emphasis added.) Paragraph ten of the protective order described the process a party could use to challenge a Confidential Information or AEO designation:

> The designation of any material or document as Confidential Information or Attorneys' Eyes Only Information is subject to challenge by any party. Before filing any motion or objection to a designation, the objecting party must meet and confer in good faith to resolve the objection informally without judicial intervention. A party that elects to challenge a designation may file and serve a motion that identifies the challenged material and sets forth in detail the basis for the challenge. The burden of proving the necessity of a designation remains with the party asserting confidentiality. Until the court rules on the challenge, all parties must continue to treat the materials as designated under the terms of this Order.

Paragraph twenty of the protective order provided that, "Nothing in this Order shall be construed as an admission or finding as to the merits of the parties' claims or the relevance, authenticity, foundation or admissibility of any document, material, transcript, or other information."

It is not clear how many, or what, documents were designated by IQS as AEO during discovery. Based on generalized arguments made by Shuttlewagon, it appears that

6

IQS designated thousands, if not hundreds of thousands, of documents as AEO.[4] However, Shuttlewagon never challenged any of IQS's AEO designations, though the protective order provided a process for doing so that would have shifted the burden to IQS to defend the designation.

Shuttlewagon designated Nathan Yoder ("Yoder"), a former Shuttlewagon employee, as one of its engineering expert witnesses. Yoder previously worked at Shuttlewagon as its director of engineering, and later as vice president of engineering. Because of Yoder's former employment at Shuttlewagon, and because Yoder held a financial interest in Nordco, Shuttlewagon's parent company, Yoder was not "independent," and was therefore not permitted access to IQS documents that had been designated AEO. Shuttlewagon filed a "Motion to Declare [Yoder] Independent Under the Agreed Protective Order." IQS Defendants and Employee Defendants opposed the motion and argued that Shuttlewagon had retained and designated another engineering expert witness, Jeffrey Ball ("Ball"), to provide testimony on the same subjects as Yoder -- "Defendants' use of Shuttlewagon's confidential and/or trade secret information to develop products." They argued that unlike Yoder, Ball was sufficiently independent from Shuttlewagon, and therefore had the right to full access to AEO materials pursuant to the terms of the protective order. The trial court denied Shuttlewagon's motion.[5] As a

---

[4]Though IQS's designation of documents as AEO is central to Shuttlewagon's first and second points on appeal, Shuttlewagon has not identified the purportedly offending documents with a proper citation to the record that complies with Rule 84.04(c), and instead relies on similarly vague and generalized arguments made at trial. For example, Shuttlewagon argues here that "[e]very single file as well as the results of the limited inspections of those files and the machine were designated [AEO]," but only supports this assertion with a similarly vague and nonspecific argument in a motion for sanctions it filed near the end of trial. [Appellant's Brief, p. 13]

[5]This ruling is not challenged on appeal.

7

result, Yoder was not permitted access to IQS's AEO materials in connection with formulating his expert opinions.

Before trial, IQS Defendants filed a motion *in limine* which asked the trial court to "order that any and all confidentiality designations or markings be redacted or otherwise removed or deleted so that they are not visible to the jury," and to order that "counsel . . . be prohibited from commenting on such redactions or prior markings."  IQS Defendants argued that this was required since the protective order provided that counsel's document designations do not constitute "[p]roof that the item is confidential" or "[a]n admission that similar information is confidential."

The motion *in limine* was argued during a pretrial conference on January 23, 2020. In opposition to the motion, Shuttlewagon argued:

> [T]he [E]mployee [D]efendants testified as part of their evidence that this type -- this information is not maintained in the industry as confidential or trade secret once the railcar mover hits the open market because anybody could figure it out. They testified exactly that they wouldn't consider any of IQS's drawings or engineering drawings or calculations to be confidential and would have no issue of Shuttlewagon having access to them because the railcar mover is on the open market. That's clearly testimony designed to attack the basis of our trade secret designation in general on the merits. So to the extent that they have designated their own engineering drawings as confidential and [AEO] is an impeachment of the defendants' testimony. Not anything on the merits, it's just a credibility attack.
>
> . . . .
>
> [T]he protective order requires that by putting that designation on there, the party is asserting in good faith that that document has confidential value that shouldn't be shown to a competitor. The fact that they're testifying differently in trial is an impeachment opportunity that we should be allowed to produce.

Shuttlewagon thus forecasted its intent at trial to impeach *the Employee Defendants'* anticipated trial testimony discounting the confidential nature of Shuttlewagon's engineering drawings and calculations by confronting them with *IQS's counsel's designations* of IQS documents as "Confidential Information" or "AEO."

After hearing arguments, the trial court ruled:

So it's my order and [] it's not an automatic -- maybe I should add that word in there, automatic admission. If I understand [Shuttlewagon's] argument, they want to use documents to the extent that it cuts at someone's credibility. . . . Credibility is always going to be an issue. *And to the extent that there are documents that are germane to credibility, I am going to allow those.* Now, I don't have the wherewithal to know exactly all the documents that you guys are privy to knowing. But that's how I'm going to handle it. So we'll have to take time to go through them or just deal with them as they come, or you'll have to be prepared to know what that is. But anything that goes to credibility is going to be fair game.

(Emphasis added.) The trial court thus made a pretrial determination that although counsel's designation of an IQS document as Confidential Information or AEO did not constitute an admission against interest, the designation could nonetheless be used to impeach the credibility of witnesses at trial, if the proper foundation could be laid.

A two-week-long jury trial began on February 6, 2020. Just before the jury was sworn, IQS Defendants again raised the *in limine* issue involving document designations not constituting admissions. The trial court reiterated its pretrial ruling:

I do still plan to take it with the case because, again, I am not putting a blanket prohibition on [Shuttlewagon] because I think it may come to a point where it is relevant with respect to credibility and other issues. However, to [IQS Defendants'] request, there are things out there that are marked confidential that are not an admission that go directly to the protective order.

9

Shuttlewagon's first witness was Yoder, who provided an expert opinion that Employee Defendants used Shuttlewagon information to build IQS's railcar mover. Yoder also testified that he was refused the opportunity to inspect all of IQS's information, specifically the engineering drawings for IQS's railcar mover, and that he was not permitted to operate IQS's railcar mover when he inspected the machine. Yoder acknowledged on cross-examination that he had not been permitted access to some of IQS's information because he was not independent.

On cross-examination, Employee Defendants inquired into Yoder's prior employment as the vice president of engineering at Shuttlewagon. Yoder testified that he was aware that Coon, Higgins, and other employees had filed complaints concerning his management style, leadership, lack of professionalism, and the direction of Shuttlewagon and its product development. Yoder acknowledged that Coon in particular made a complaint twelve to eighteen months before her resignation, and again before she resigned in 2017. The complaints included a concern that Yoder and other Shuttlewagon managers were using a Kansas City Royals suite to leverage suppliers. The complaints were investigated, and Yoder testified that he and other members of Shuttlewagon's management were disciplined. Each had to give up their personal interest in the Royals suite, Yoder was prohibited from investing in outside companies without approval from Nordco, and Yoder was prohibited from drinking at business events or lunches.

Shuttlewagon called Coon as the second witness during its case-in-chief. During direct examination, Coon testified:

10

[Shuttlewagon's counsel]: And so it's your position that engineering drawings by IQS are not the type of information that [if] disclosed to a business competitor may harm IQS's competitive position?

[Coon]: I don't know a lot about our competitive position, but no. I mean, I don't really see how it would help them that much. We have different parts so them knowing the dimensions of our parts wouldn't really [affect] their machine.

[Shuttlewagon's counsel]: You heard your counsel ask [Yoder] whether he was aware that the reason he couldn't access certain[] documents from IQS was because he was not truly independent. Do you remember that question?

[Coon]: Yes, I do.

[Shuttlewagon's counsel]: Do you know why [Yoder] was not permitted to access certain documents?

[Coon]: I think it's because you just said; because he wasn't independent.

[Shuttlewagon's counsel]: And he wasn't independent because he has stock with Shuttlewagon?

[Coon]: That wasn't really up [to] me. I -- you know, our counsel dealt with that situation.

[Shuttlewagon's counsel]: Fair enough. I am going to speak very generally here for a bit. Did you know generally that your counsel entered into an agreement on your behalf under which certain protections were made for documents? . . .

***[IQS's counsel]: I'm going to object on foundation*** . . . .

(Emphasis added.) IQS's objection was then discussed at the bench, out of the hearing of

the jury:

[Shuttlewagon's counsel]: [M]y next question is a statement to the jury that I am not going to treat this as an admission that she[] thinks any of this information is trade secret or confidential. That is what the protective order says, but she's taking an inconsistent position that I think that I should be able to impeach her with that.

11

. . . .

[IQS's counsel]: She lacks foundation, number one. Number two, we have already had a ruling that this may not be admitted as an admission of the party opponent and I contend there is no other purpose for this line of questioning.

. . . .

[Trial court]: [Shuttlewagon's counsel], [a]ssuming you can lay a foundation, where do you want to go?

[Shuttlewagon's counsel]: Your Honor, the jury has heard several times that our expert could not access certain documents because he was not truly independent. *The position IQS and all of the [E]mployee [D]efendants are now taking is that there's no information that IQS has or that Shuttlewagon has that would be considered the type of information that if disclosed to a business competitor may harm IQS's competitive position*. . . . It's attacking the credibility and it's showing not as an admission that this is trade secret, this is confidential, but that it's an inconsistent position *and also explains why our witnesses have not been able to access certain documents.*

[Trial court]: Okay. [IQS's counsel]?

[IQS's counsel]: Yes. Your Honor, the purpose of this testimony is to suggest by markings on documents which were made pursuant to a protective order that said marking those documents was not an admission of any kind. *Secondly, this witness did not choose any of the designations put on any of those documents. If [Shuttlewagon's counsel] would like to make a motion for sanctions against me or . . . anybody who is actually responsible for putting those markings on a document, I would welcome that motion*. . . .

(Emphasis added.)

After hearing extensive arguments, the trial court determined that it would allow

Shuttlewagon's counsel to *voir dire* Coon outside of the presence of the jury in order to

determine whether Shuttlewagon could lay the proper foundation to impeach Coon with IQS's counsel's document designations. The trial court explained its ruling:

> [Trial court]: Assuming [Shuttlewagon's counsel] could lay foundation, I am going to overrule [IQS's foundation objection] if you make it again. If I feel she makes it, [] I'm going to let her proceed as she just outlined.

> [IQS's counsel]: Okay. So I take that to mean, then, that she may ask questions about confidentiality designations once she gets to that point.

> [Trial court]: Yes. If she lays the proper foundation, yes.

> [IQS's counsel]: Okay.

> [Trial court]: . . . *[L]et me back totally up. . . . I am going to sustain your objection as to foundation, allow her to back up, lay the [proper] foundation. If she lays the proper foundation, I'll allow her to continue her line of questions as she just outlined for the court*.

> [IQS's counsel]: All right. And you have not ruled that these are admissions, certainly.

> [Trial court]: I have not.

(Emphasis added.)

Before *voir dire* of Coon could proceed, and while the parties were still outside of the hearing of the jury, IQS's counsel announced his intent to withdraw all of the Confidential Information and AEO designations he had placed on IQS documents, and asked the court to adjourn for the remainder of the day so IQS could "figure out how we're going to handle this on the defense side." The trial court refused IQS's request to adjourn the proceedings, instructed IQS's counsel that if IQS intended to withdraw its Confidential Information and AEO designations it needed to do so in writing, and directed Shuttlewagon to proceed with its *voir dire* of Coon.

13

Shuttlewagon's counsel then questioned Coon in an effort to lay a foundation to impeach Coon with IQS's counsel's document designations. At the conclusion of the *voir dire*, the trial court sustained IQS's foundation objection, preventing Shuttlewagon from impeaching Coon with IQS's counsel's designation of IQS documents.[6]

Shuttlewagon's *voir dire* of Coon occurred on Friday, February 7, 2020, at the end of the second day of trial. On Sunday, February 9, 2020, IQS filed a written withdrawal of its document designations, which, in part, stated:

> In spite of the Court's orders and the agreement of [Shuttlewagon's] counsel with said orders, [Shuttlewagon's] counsel now seeks to introduce evidence of designations made by defense counsel as admissions of defendants for the purpose of impeachment and "credibility." [] Even though defense counsel regards such use of those designations as entirely improper, *in order to remove any risk that such designations could be improperly introduced or referenced by [Shuttlewagon's] counsel in such a fashion, defense counsel hereby withdraws all such designations.* [] This withdrawal should not be construed as a change in any substantive position by any defendant but, rather, the reiteration by defense counsel that the initial designations, pursuant to the terms of the protective orders, were never intended as substantive positions on any issue in the first instance.

(Emphasis added.) Trial proceeded through the following week.

On February 14 and 18, 2020, Employee Defendants presented their case-in-chief. Prior to trial, IQS Defendants and Employee Defendants had deposed the chief financial officer of Nordco, Dan Griesbach ("Griesbach"), and the chief executive officer of Nordco, Bruce Boczkiewicz ("Boczkiewicz"). Employee Defendants played portions of these depositions at trial. The deposition transcripts for Griesbach and Boczkiewicz were not introduced as exhibits and the portions of the depositions played for the jury were not

---

[6]This ruling is not challenged on appeal.

14

transcribed by the court reporter at trial. However, portions of the deposition transcripts were attached to Shuttlewagon's motion for new trial, with no indication from the defendants that the portions of the transcripts attached included testimony that had not been heard by the jury. Relevant to this appeal, it appears the jury heard Griesbach testify as follows during his deposition:

> [IQS's counsel]: [A]fter over two years of litigation and having [Yoder] inspect a BOSS Railcar mover, Nordco and Shuttlewagon cannot name one single aspect of a BOSS Railcar mover that is the result of a stolen trade secret from Shuttlewagon; isn't that right?
>
> [Shuttlewagon's counsel]: Object to the form. Foundation.
>
> [Griesbach]: I mean, [Yoder's] -- my understanding is [Yoder's] inspection was very preliminary. He was not allowed to complete his inspection. We've not seen the engineering [] documents as [our counsel] has referred to. Our engineering legal -- our engineering expert has not been able to see those. So based on feedback through this process from my experts, no, they've not been able to conclude their work; and therefore, I think it's an open question.

On February 17, 2020, eight days after IQS withdrew its Confidential Information and AEO designations in writing as directed by the trial court, Shuttlewagon filed a motion for sanctions against IQS and its counsel alleging discovery abuses. Shuttlewagon argued that IQS and its counsel committed fraud on the court, abused discovery, and willfully violated the protective order because IQS did not make AEO designations in good faith, but rather made its designations with the intent to impede Shuttlewagon's "ability to prepare and present its case by withholding critical documents

from [Shuttlewagon] and its primary railcar mover engineering expert, [Yoder]."[7]

Shuttlewagon asked the trial court to sanction IQS and its defense counsel in the following ways:

> 1) Find that IQS and/or Defense Counsel obstructed discovery through their improper use of the AEO designation and violated the requirement that such designations be made in good faith;
>
> 2) Order that [IQS] and/or defense counsel reimburse Shuttlewagon for all costs associated with the motion practice concerning [Yoder's] "independence" and ability to freely access and analyze IQS's AEO railcar mover drawings, and those associated with [Shuttlewagon's] retention of a second "independent" expert [Ball] (whose lack of familiarity with railcar movers impeded his ability to review the documents);
>
> 3) Exclude all questions and argument regarding the "ability" of Shuttlewagon's lay witnesses to identify Shuttlewagon trade secrets incorporated into the IQS product and Shuttlewagon's product and instruct the jury to disregard any such evidence previously introduced; and
>
> 4) Enter default judgment against IQS for its discovery abuses impairing Shuttlewagon's ability to prepare and present its case.

Just before closing arguments, the trial court confirmed its ruling on Shuttlewagon's motion for sanctions, on the record:[8]

> Sanctions are reserved for when the court feels like there is bad faith or something nefarious or something that has gone on by one of the parties. This court has obviously been present throughout this trial and even before trial began with the preparation of this case. The designation of AEO, attorneys' eyes only, *I believe all parties participated in good faith as they saw fit to protect their clients. The withdrawal by [IQS Defendants] at trial this court believes was in [] response to trial -- situations occurring at trial; in other words, not done in bad faith, not done to prevent counsel, specifically [Shuttlewagon], from preparation.* More

---

[7]Shuttlewagon's motion for sanctions did not complain about IQS's withdrawal of the Confidential Information designation on IQS documents.

[8]The trial court did not enter a written order ruling on Shuttlewagon's motion for sanctions. In confirming its ruling on the motion just prior to closing arguments, the trial court's on-the-record comments suggest that the ruling had been discussed off the record with trial counsel the day before.

16

specifically, ***not done in bad faith.*** I said last night and I'll say again on the record, this court has enough experience to know when bad lawyering occurs. It just doesn't occur in a moment. It's over time and it continues. And ***none of the parties have engaged in bad lawyering and unethical behavior. So therefore, I'm going to deny sanctions in this matter***.

(Emphasis added.)

The case was submitted to the jury with instructions and verdict directors on Shuttlewagon's thirty-one claims. Instruction 7, the verdict director for Shuttlewagon's computer tampering claim against Employee Defendants, directed the jury to rule in favor of Shuttlewagon if they believed the following:

First, [] Shuttlewagon owned a computer system, computer network, computer program, [or] computer service; and

Second, Defendant(s) knowingly and without authorization or without reasonable grounds to believe that Defendant(s) had such authorization:

a. Accessed a computer system or computer network and intentionally examined information about another person; or,

b. Disclosed or took data residing or existing internal or external to [] Shuttlewagon's owned computer system, computer network, computer program, or computer service; or,

c. Received, retained, used, or disclosed any data that Defendant(s) knew or believed was obtained in violation of the Missouri Computer Tampering Act; and

Third, that [] Shuttlewagon was thereby damaged.

IQS Defendants proposed Instruction 8, which addressed Shuttlewagon's purported failure to mitigate damages in connection with its computer tampering claim. The instruction was submitted over Shuttlewagon's objection that it did not cite to case law or

17

statutory authority as required by Committee Comment to MAI 32.01. Instruction 8 provided:

> ***If you find in favor of [] Shuttlewagon on its claim for computer tampering*** against Defendants, you must find that [] Shuttlewagon failed to mitigate damages if you believe:
>
>> First, [] Shuttlewagon failed to revoke Defendants' log-in credentials after Defendants terminated their employment with [] Shuttlewagon, and
>>
>> Second, [] Shuttlewagon thereby failed to use ordinary care, and
>>
>> Third, [] Shuttlewagon thereby sustained damage that would not have occurred otherwise. . . .

(Emphasis added.)

Instruction 26, the verdict director for Shuttlewagon's claim for unfair competition against Employee Defendants and IQS Defendants, provided that the jury's verdict "must be for [] Shuttlewagon on its claim against Defendants for unfair competition if [it] believe[d]" that Shuttlewagon possessed confidential information, that the defendants misappropriated the information and used it to their competitive advantage, and that Shuttlewagon was damaged. Employee Defendants offered Instruction 27, which addressed Shuttlewagon's failure to mitigate damages in connection with its unfair competition claim. Instruction 27 was submitted over the same objection Shuttlewagon made in connection with Instruction 8. Instruction 27 provided, "***[i]f you find in favor of [] Shuttlewagon on its claim for unfair competition*** against Defendants, you must find that [] Shuttlewagon failed to mitigate damages if you believe . . . " and followed with similar elements to those set forth in Instruction 8. (Emphasis added.)

18

The next day, the jury returned its verdicts, which found in favor of IQS Defendants and Employee Defendants on twenty-nine of Shuttlewagon's thirty-one claims. The jury found in favor of Shuttlewagon on its claim of breach of the duty of loyalty against Higgins and Coon, and awarded monetary damages of $7,500 and $3,500 respectively. On March 6, 2020, the trial court entered its judgment ("Judgment") reflecting the jury's verdicts.[9]

Shuttlewagon filed a timely motion for new trial on its claims of unfair competition (Count IV of the amended petition), computer tampering (Count I of the amended petition), and conspiracy to commit computer tampering (Count III of the amended petition). Shuttlewagon asserted that the trial court erred in admitting irrelevant and improper character evidence against Yoder. Shuttlewagon asserted that the trial court erred in admitting evidence and permitting argument concerning Shuttlewagon's lay witnesses' inability to "trace" the use of Shuttlewagon's information into IQS's railcar mover because the evidence and argument were confusing to the jury and allowed defendants to abuse the protective order. Shuttlewagon also asserted that the trial court erred in submitting mitigation of damages instructions on the unfair competition and computer tampering claims. The trial court denied Shuttlewagon's motion for new trial.

---

[9]The Judgment does not address IQS's counterclaims, but is nonetheless a final judgment for purposes of appeal. IQS's counsel "announced an intention to withdraw the counterclaim[s]" during Employee Defendants' case-in-chief. During closing arguments, IQS's counsel stated, "I told you in opening that I was going to be asking for damages for slander that would have required calling even more witnesses, putting on more testimony, and at the end of the day, after consultation with [] Ying, *we withdrew those counterclaims* and we will be very pleased to be simply exonerated in this case." (Emphasis added.) Though it would have been preferred for the Judgment to note that IQS's counterclaims had been withdrawn at trial, it is plain from a review of the trial record that the counterclaims were abandoned as no instructions were submitted to the jury for the counterclaims. *State ex rel. Kansas City v. Campbell*, 505 S.W.3d 299, 300 (Mo. App. W.D. 2016) ("A claim that [is] not submitted to the jury at the conclusion of the evidence is considered abandoned.").

19

Shuttlewagon appeals.

**Summary of Points Relied on and Standard of Review**

Shuttlewagon challenges the Judgment's disposition of Shuttlewagon's claims for unfair competition (Count IV of the amended petition), computer tampering (Count I of the amended petition), and conspiracy to commit computer tampering (Count III of the amended petition). Shuttlewagon asserts four points on appeal.

Shuttlewagon's first point challenges the trial court's denial of the motion for sanctions against IQS and IQS's counsel. Shuttlewagon's second and third points argue that the trial court abused its discretion in admitting argument and evidence concerning Shuttlewagon's inability to "trace" the use of Shuttlewagon information into the development of IQS's railcar mover, and in admitting improper character evidence concerning workplace misconduct under Yoder's management. Shuttlewagon's fourth point asserts that the trial court erroneously instructed the jury that Shuttlewagon had a duty to mitigate damages in connection with its unfair competition and computer tampering claims.

"We review a trial court's decision to invoke its inherent powers to sanction for an abuse of discretion." *Hale v. Cottrell, Inc.*, 456 S.W.3d 481, 488 (Mo. App. W.D. 2014) (citing *Rea v. Moore*, 74 S.W.3d 795, 799 (Mo. App. S.D. 2002)). "Trial courts are vested with discretion about whether to impose sanctions for discovery violations, and the exercise of that discretion will not be disturbed on appeal unless it is exercised unjustly." *White v. City of Ladue*, 422 S.W.3d 439, 453 (Mo. App. E.D. 2013). "We

20

view the evidence in the light most favorable to the trial court's ruling." *Hale*, 456 S.W.3d at 488.

"The admission or exclusion of evidence lies within the sound discretion of the trial court and will not be disturbed absent clear abuse of discretion." *Sherrer v. Boston Scientific Corp.*, 609 S.W.3d 697, 705 (Mo. banc 2020) (citing *Cox v. Kan. City Chiefs Football Club, Inc.*, 473 S.W.3d 107, 114 (Mo. banc 2015)). "A ruling constitutes an abuse of discretion when it is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* (quoting *Cox*, 473 S.W.3d at 114). "[W]e 'will find reversible error only where an abuse of discretion is found and the [appellant] can demonstrate prejudice.'" *Burns v. Granger*, 613 S.W.3d 800, 803 (Mo. App. W.D. 2020) (quoting *In Matter of D.N.*, 598 S.W.3d 108, 115 (Mo. banc 2020)).

"'Whether a jury was properly instructed is a question of law that [we] review[ ] *de novo*.'" *Wynn v. BNSF Ry. Co.*, 588 S.W.3d 907, 911 (Mo. App. W.D. 2019) (quoting *Spence v. BNSF Ry. Co.*, 547 S.W.3d 769, 777 (Mo. banc 2018)).

## Analysis

### Point One: The trial court did not abuse its discretion when it denied Shuttlewagon's motion for sanctions against IQS and its counsel

Shuttlewagon's first point on appeal argues that it was an abuse of discretion for the trial court to deny Shuttlewagon's motion for sanctions against IQS and its counsel because IQS and its counsel's abusive use of the AEO designation prejudiced Shuttlewagon's ability to present its case. Specifically, Shuttlewagon contends that "[t]he

21

trial court abused its discretion when it denied Shuttlewagon's motion for sanctions because the denial was against the logic of the circumstances in that [IQS's] abuse of the [AEO] designation enabled defendants [to] manufacture a defense that Shuttlewagon was then not permitted to refute." [Appellant's Brief, p. 18]

"A trial court may use its inherent powers and impose sanctions [only] when parties act in bad faith." *Davis v. Wieland*, 557 S.W.3d 340, 349 (Mo. App. W.D. 2018) (quoting *Hale*, 456 S.W.3d at 488) (bracketed material in original). "While there is no concrete definition of 'bad faith,' it embraces something more than bad judgment or negligence." *Id.* at 350 (quoting *A.J.H. ex rel. M.J.H. v. M.A.H.S.*, 364 S.W.3d 680, 683 (Mo. App. E.D. 2012)). "Bad faith 'embraces actual intent to mislead or deceive another,' or 'imports a dishonest purpose, moral obliquity, conscious wrongdoing, breach of a known duty through some ulterior motive or ill will partaking of the nature of fraud.'" *Hale*, 456 S.W.3d at 488 (quoting *A.J.H.,* 364 S.W.3d at 683).

A trial court may also impose sanctions when a party commits fraud on the court. *Rea*, 74 S.W.3d at 800-01. Fraud on the court occurs when "it can be demonstrated, clearly and convincingly, that a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." *Id.* at 800 (internal quotation marks and citation omitted). "A fraud case generally fails 'when the facts and circumstances presented are as consistent with honesty and good faith as they are with fraud.'" *Hale*, 456 S.W.3d at 491 (quoting *Blanke v. Hendrickson,* 944 S.W.2d 943, 944 (Mo. App. E.D.1997)).

22

Shuttlewagon's point on appeal states that IQS and its counsel abusively used the AEO designation, and thus presumes sanctionable conduct in claiming that the trial court erred in denying the motion for sanctions. Yet, the trial court expressly found to the contrary by concluding that the initial designation of documents as AEO was done in good faith, and that the withdrawal of the AEO designation was in response to trial developments and was not in bad faith. The trial court ruled that "none of the parties have engaged in bad lawyering and unethical behavior. So therefore, I'm going to deny sanctions in this matter." Shuttlewagon's point on appeal emphasizes the purported effect of the AEO designations, but does not challenge the trial court's findings that no sanctionable conduct occurred. This notable omission is magnified by the argument portion of Shuttlewagon's brief, where no meaningful effort has been made to address whether the trial court abused its discretion by finding that no sanctionable conduct occurred.[10] The failure to expressly challenge the trial court's findings that no sanctionable conduct occurred in connection with the initial AEO designations or their withdrawal is fatal to Shuttlewagon's appeal. *See STRCUE, Inc. v. Potts*, 386 S.W.3d 214, 219 (Mo. App. W.D. 2012) (holding that appellant's failure to challenge each basis that could support affirming judgment is fatal to appeal).

---

[10]Shuttlewagon summarily hypothesizes in its brief that it must be the case that IQS's counsel did not consult with the Employee Defendants or IQS before designating documents as AEO, and that this was a fraud on the court. [Appellant's Brief, pp. 23-24] Shuttlewagon also summarily hypothesizes that if the AEO documents were not competitively valuable as to permit the designation to be withdrawn at trial, then the only purpose for the designation had to have been to impede Shuttlewagon's ability to present its case. [*Id*.] These bare, conclusory arguments are not supported by authority, and are not legally effective to constitute a challenge to the trial court's express findings that IQS and its counsel acted in good faith in initially designating documents as AEO, and in withdrawing that designation in response to trial situations. "Failure to support a point with relevant legal authority or argument beyond conclusory statements preserves nothing for appeal." *Blanks v. Fluor Corp*., 450 S.W.3d 308, 384 (Mo. App. E.D. 2014) (citation omitted).

Even were we to disregard this fatal deficiency, we would not find Shuttlewagon's point to be meritorious. Shuttlewagon complains that IQS's AEO designations afforded the defendants an unfair strategic advantage because the designations permitted IQS Defendants and Employee Defendants to "manufacture a defense that Shuttlewagon was then not permitted to refute." [Appellant's Brief, p. 18] In support of this argument, Shuttlewagon contends that IQS Defendants and Employee Defendants were permitted to highlight that no Shuttlewagon witness could identify or "trace" confidential Shuttlewagon information to IQS's railcar mover, while Shuttlewagon was not permitted to explain why, or to impeach Coon "with [the AEO designations as] prior inconsistent statements about the confidential nature of railcar mover design drawings and calculations." [Appellant's Brief, pp. 24-25]

This alleged strategic advantage, if it in fact existed, did *not* result, however, from the trial court's denial of the motion for sanctions, the only trial court action about which point one complains. The motion for sanctions was not filed by Shuttlewagon until more than a week after IQS withdrew its AEO designations, and a mere two-and-a-half days before a case tried over two weeks was submitted to the jury.

Moreover, Shuttlewagon's characterization of the alleged strategic advantage enjoyed by the defendants is grossly inaccurate and misleading. First, though it is true that the trial court sustained IQS's objection to Shuttlewagon's attempt to impeach Coon with IQS's counsel's AEO designations, that was because Shuttlewagon could not lay a proper foundation to permit the impeachment. The trial court had otherwise consistently indicated its intent, both pretrial and during trial, to permit Shuttlewagon to use the AEO

24

designations to impeach witnesses, if a proper foundation could be laid. The trial court's denial of the motion for sanctions played no role in limiting Shuttlewagon's cross-examination of Coon, nor could it have, as the attempt to impeach Coon occurred two days *before* IQS formally withdrew its AEO designations, and ten days before Shuttlewagon filed its motion for sanctions. And, Shuttlewagon has not challenged the trial court's evidentiary ruling prohibiting Shuttlewagon from impeaching Coon with the AEO designations because an insufficient foundation was laid to do so. Shuttlewagon's attempt on appeal to recast its unsuccessful attempt to impeach Coon as demonstrative of trial court error in denying the motion for sanctions is disingenuous.

Second, IQS Defendants correctly point out that Shuttlewagon knew well in advance of trial that IQS Defendants and Employee Defendants planned to testify that nothing in IQS's railcar mover was new or confidential, as several Employee Defendants testified to this same effect in their depositions. Shuttlewagon's awareness of the Employee Defendants' anticipated trial testimony was demonstrated when Shuttlewagon opposed IQS's motion *in limine* seeking to prevent all references at trial to IQS counsel's document designations.[11] In opposing the motion *in limine*, Shuttlewagon emphasized its intent to use IQS's AEO designations to Shuttlewagon's advantage by seeking to impeach witnesses who testified that the IQS railcar mover included nothing new or confidential.

---

[11]At the pretrial conference, Shuttlewagon argued:

[T]he [E]mployee [D]efendants testified as part of their evidence that this type -- this information is not maintained in the industry as confidential or trade secret once the railcar mover hits the open market because anybody could figure it out. They testified exactly that they wouldn't consider any of IQS's drawings or engineering drawings or calculations to be confidential and would have no issue of Shuttlewagon having access to them because the railcar mover is on the open market.

Shuttlewagon's present contention that the trial court erred when it denied the motion for sanctions because IQS and its defense counsel were thus permitted to use AEO designations "as a sword facilitating [its] last-minute about-face assertion at trial that nothing in the rail car mover business is new or confidential" is disingenuous, and is not born out by the record. [Appellant's Brief, p. 14]

Finally, Shuttlewagon has not established any relationship between the trial court's denial of the motion for sanctions and Shuttlewagon's alleged inability to admit evidence at trial to explain why witnesses could not "trace" Shuttlewagon information into IQS's rail car mover. Shuttlewagon has not identified a single occasion where the trial court refused to permit Shuttlewagon to ask a witness to explain his or her inability to "trace" purportedly confidential information into IQS's railcar mover.[12] And even if Shuttlewagon could identify occasions where it was not permitted to admit evidence of this nature, attendant error, if any, would be in the trial court's evidentiary ruling and not related to denial of the motion for sanctions. It is telling on this point that the motion for sanctions did not seek a sanction that would have permitted Shuttlewagon to admit previously excluded evidence, and instead sought only to:

> ***Exclude all questions and argument*** regarding the "ability" of Shuttlewagon's lay witnesses to identify Shuttlewagon trade secrets incorporated into the IQS product and Shuttlewagon's product and ***instruct the jury to disregard any such evidence previously introduced*** . . . .

(Emphasis added.) Shuttlewagon's contention that the motion for sanctions should have been granted because Shuttlewagon was deprived of the ability to admit evidence

_____

[12]We discuss, *infra*, that to the contrary, the jury ***did*** hear evidence and argument explaining that Shuttlewagon's lay witnesses had not been allowed to review all of the documents that would have been necessary to permit them to "trace" confidential information.

explaining a witness's inability to trace Shuttlewagon information into IQS's railcar mover is without merit.

For all of these reasons, we conclude that the trial court did not abuse its discretion in denying Shuttlewagon's motion for sanctions. This conclusion is reinforced by the fact that Shuttlewagon never challenged IQS's AEO designations prior to trial, though the terms of the protective order would have permitted it to do so, and though Shuttlewagon's counsel had full access to the AEO designated documents pursuant to the terms of the protective order. Shuttlewagon's late filing of a motion for sanctions to accuse IQS and its counsel of bad faith and fraud when Shuttlewagon could have challenged the good faith nature of IQS's AEO designations during discovery or at any time before trial appears to have been motivated by Shuttlewagon's unsuccessful efforts to deploy its trial strategy to use IQS's AEO designations to Shuttlewagon's tactical advantage. But Shuttlewagon's inability to use IQS's AEO designations to impeach witnesses at trial was not caused by the initial AEO designations, by the withdrawal of the AEO designations, or by the trial court's denial of the motion for sanctions, and was instead a result of unchallenged evidentiary rulings that required a proper foundation to be laid before Shuttlewagon could impeach witnesses with IQS's counsel's document designations.

Point One is denied.

**Point Two: The trial court did not err in permitting the admission of evidence and argument concerning Shuttlewagon's lay witnesses' inability to "trace" the use of Shuttlewagon's information into IQS's railcar mover design**

Shuttlewagon's second point on appeal argues that the trial court abused its discretion when it permitted the admission of evidence and argument concerning

27

Shuttlewagon's lay witnesses' inability to "trace" Shuttlewagon's information into the IQS railcar mover design because the evidence was not legally relevant as it "confused the jury in that the [trial] court prevented Shuttlewagon from explaining that [IQS] barred the witnesses from reviewing key evidence that would have permitted such 'tracing.'" [Appellant's Brief, p. 27] Shuttlewagon does not challenge the logical relevance of evidence that Shuttlewagon's lay witnesses were unable to "trace" Shuttlewagon information into the IQS railcar mover design. Instead, Shuttlewagon argues that this logically relevant evidence became legally irrelevant[13] (and thus inadmissible) ***because*** Shuttlewagon was not permitted to explain why the lay witnesses were unable to "trace" Shuttlewagon information into the IQS railcar mover design. Thus, though Shuttlewagon's point on appeal purports to allege error in the trial court's admission of evidence, in fact Shuttlewagon's point on appeal depends for its success on establishing error in the exclusion of evidence.

Shuttlewagon's contention that it was not permitted to admit evidence explaining why lay witnesses were unable to "trace" Shuttlewagon information into the IQS railcar mover design is not preserved for our review. Rule 84.04(e) provides in pertinent part that "[f]or each claim of error, the argument shall . . . include a concise statement describing whether the error was preserved for appellate review; [and] if so, how it was

---

[13]"Evidence is logically relevant if it tends to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence, or if it tends to corroborate evidence which itself is relevant and bears on the principal issue of the case." *Cox*, 473 S.W.3d at 116. "Logical relevance is 'a very low threshold.'" *Kappel v. Prater*, 599 S.W.3d 189, 193 (Mo. banc 2020) (quoting *State v. Anderson*, 76 S.W.3d 275, 277 (Mo. banc 2002)). "Once logical relevance is established, '[l]egal relevance weighs the probative value of the evidence against its costs--unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness.'" *Id*. (quoting *Anderson*, 76 S.W.3d at 276).

28

preserved . . . ."  Shuttlewagon's brief identifies ***no occasions*** where the trial court prevented Shuttlewagon from admitting offered testimony or evidence explaining why a witness was unable to trace Shuttlewagon information into the IQS railcar mover design. Our review of the record reveals that to the contrary, the jury heard evidence and argument to that effect on several occasions.

Yoder and Coon both testified that Yoder was not permitted to review certain IQS engineering documents, and was not permitted to operate IQS's railcar mover, in his role as one of Shuttlewagon's expert witness because he was not "independent."  In addition, in a portion of Griesbach's deposition testimony played for the jury, Nordco's chief financial officer stated as follows:[14]

> [IQS's counsel]: [A]fter over two years of litigation and having [Yoder] inspect a BOSS Railcar mover, Nordco and Shuttlewagon cannot name one single aspect of a BOSS Railcar mover that is the result of a stolen trade secret from Shuttlewagon; isn't that right?
>
> [Shuttlewagon's counsel]: Object to the form.  Foundation.[15]

---

[14]In its brief, Shuttlewagon identified only two instances where its lay witnesses were purportedly asked about their inability to "trace" information into the IQS railcar mover design.  One instance involved Griesbach. The other instance involved Boczkiewicz.  Shuttlewagon concedes that both witnesses testified at trial by playing portions of their videotaped depositions to the jury, but that the deposition transcripts were not entered into evidence, and the video testimony was not transcribed into the record.  [Appellant's Motion for Add. to L.F., p. 2] "'Documents, depositions, etc., which are . . . not contained in the legal file[] are not part of the record and will not be considered on appeal.'"  *Porter v. Toys 'R' Us-Delaware, Inc.*, 152 S.W.3d 310, 322 (Mo. App. W.D. 2004) (quoting *Choate v. Natvig,* 952 S.W.2d 730, 733 (Mo. App. S.D. 1997)).

Portions of Griesbach's deposition testimony were attached to Shuttlewagon's motion for new trial, and the portions attached included testimony touching on the issues raised by Shuttlewagon's second point on appeal.  We have generously treated the portions of Griesbach's deposition that are attached to the motion for new trial as a part of the record on appeal.  Though portions of Boczkiewicz's deposition transcript were attached to the motion for new trial, the portions attached have no bearing on the issue raised in Shuttlewagon's second point on appeal.  Thus, there is no record support for Shuttlewagon's contention that Boczkiewicz was asked about his inability to trace Shuttlewagon information into IQS's railcar mover design.

[15]Shuttlewagon's counsel renewed this objection before this portion of the Griesbach deposition was played at trial.  Shuttlewagon's counsel argued:

> Judge, my objection is to the question about whether [Griesbach] could identify particular trade secrets of Shuttlewagon that have been incorporated into the BOSS machine, I think the court's already overruled my objection. My objection is, again, that they hid that information from

29

[Griesbach]: I mean, [Yoder's] -- my understanding is [Yoder's] inspection was very preliminary. ***He was not allowed to complete his inspection. We've not seen the engineering [] documents as [our counsel] has referred to.*** Our engineering legal -- ***our engineering expert has not been able to see those.*** So based on feedback through this process from my experts, no, ***they've not been able to conclude their work; and therefore, I think it's an open question.***

(Emphasis added.)

This trial testimony refutes Shuttlewagon's unsupported contention that the trial court prohibited Shuttlewagon from explaining why its witnesses could not "trace" Shuttlewagon's information into IQS's railcar mover design. In addition, during closing argument, Shuttlewagon repeatedly referred to the fact that its witnesses had been prohibited from reviewing materials that would have enabled them to "trace" Shuttlewagon's information.[16]

Finally, it is noteworthy that Shuttlewagon designated Ball as an expert witness. Unlike Yoder, Ball was independent, and was thus permitted to review all of the AEO

---

[Griesbach] by designating it [AEO] throughout this case only to here at trial say, ["]I'm withdrawing all those designations["] . . . .

The trial court overruled the objection. Shuttlewagon's argument repeated the refrain incorporated in its contemporaneously filed motion for sanctions, but did not in any manner complain that Shuttlewagon had been prohibited from explaining why its lay witnesses could not trace Shuttlewagon information. Of course, in the question and answer that followed, Griesbach did exactly that.

[16]Specifically, Shuttlewagon's counsel argued:

[Defendants] . . . bring[] [Griesbach], the chief financial officer of the parent company and ask[] him to trace trade secrets knowing full well that he's never seen a BOSS machine, knowing full well that he's never looked at any BOSS drawings, knowing full well that he's not an engineer.

. . . .

[Y]ou've heard defendants inject evidence . . . of Shuttlewagon lay witnesses who were unable to identify specific trade secrets or were unable to trace those. What defense counsel conveniently leaves out and tries to downplay is that not one of those lay witnesses that they talked to has ever seen a BOSS railcar mover in person or had the opportunity to review any BOSS engineering drawings.

. . . .

Even [Yoder], who left Shuttlewagon and the railcar mover market altogether, was not allowed to turn on a BOSS during his inspection.

30

designated materials produced by IQS pursuant to the terms of the protective order. Ball was designated by Shuttlewagon to provide testimony on "Defendants' use of Shuttlewagon's confidential and/or trade secret information to develop products." Employee Defendants deposed Ball and referenced his expected testimony in their opening statements. Yet, Shuttlewagon did not call Ball at trial. It is not clear why Shuttlewagon chose not to call Ball as a witness to provide *expert* testimony to establish that Shuttlewagon's information could be "traced" into IQS's railcar mover design.[17] However, its decision not to call Ball materially undermines the credibility of Shuttlewagon's unsubstantiated complaint that it was prejudiced in presenting its case because it was not permitted to explain why its *lay* witnesses were unable to provide the same testimony.

Shuttlewagon has not demonstrated that it was prevented from admitting evidence explaining why its lay witnesses could not "trace" Shuttlewagon information into IQS's railcar mover design. As a result, Shuttlewagon cannot establish that logically relevant evidence that lay witnesses were unable to "trace" Shuttlewagon information into the IQS railcar mover design was erroneously admitted because it was not legally relevant.

Point Two is denied.

*Point Three: The trial court did not err in admitting evidence and permitting argument concerning Yoder's workplace misconduct*

---

[17]A hint of an explanation is found in Shuttlewagon's motion for sanctions where Shuttlewagon sought reimbursement "for all costs associated with the motion practice concerning [Yoder's] "independence" and ability to freely access and analyze IQS's AEO railcar mover drawings, and those associated with [Shuttlewagon's] retention of *a second "independent" expert [Ball] (whose lack of familiarity with railcar movers impeded his ability to review the documents)*." (Emphasis added.)

31

Shuttlewagon's third point on appeal argues that the trial court abused its discretion in admitting evidence and permitting argument concerning workplace misconduct allegations involving Yoder because the evidence was not legally relevant and constituted improper character evidence.

As required by Rule 84.04(e), Shuttlewagon identified where in the record it contends the evidentiary errors about which it complains were preserved for our review. Each citation to the record involves testimony from either Griesbach or Boczkiewicz.[18] However, several of the record citations identified by Shuttlewagon do not support the contention that evidence about Yoder's workplace misconduct was admitted over Shuttlewagon's objection, and instead reflect that Shuttlewagon's objections were sustained.[19]

Even disregarding this anomaly, there is no merit to Shuttlewagon's point on appeal which complains that: (1) Griesbach was permitted to testify that there was an individual employee complaint lodged in 2015 "that alleged certain things including . . . [Yoder's] management style and how he treated his employees"; (2) Boczkiewicz was permitted to testify that there was a report that Yoder consumed alcohol during the workday; and (3) Boczkiewicz was permitted to testify about an investigation undertaken by Nordco's human resources department regarding Shuttlewagon's employees' misuse of

---

[18]As previously explained, the testimony from these witnesses was presented to the jury by playing videotaped depositions. However, that testimony was not transcribed by the court reporter, and the deposition transcripts were not admitted into evidence as to permit their inclusion in the record on appeal. We have generously credited Shuttlewagon with the benefit of treating as part of the record on appeal the portions of Griesbach's and Boczkiewicz's deposition transcripts attached to Shuttlewagon's motion for new trial.

[19]For example, the majority of Shuttlewagon's argument relies on a portion of Griesbach's deposition wherein the trial court actually sustained Shuttlewagon's objection. [L.F. Doc. 115, p. 227, line 21 through p. 229, line 7] The same is true with both of Shuttlewagon's citations to the trial transcript. [Tr. 984-87; 2154]

a Kansas City Royals baseball suite.[20] [L.F. Doc. 115, p. 227 lines 8-13; L.F. Doc. 117, p. 158 line 6 through p. 159 line 22] Even if this evidence was erroneously admitted through the testimony of either Griesbach or Boczkiewicz, (an issue we need not address), Shuttlewagon is unable to establish prejudicial error because the complained of evidence is cumulative of evidence earlier admitted without objection. "A party cannot be prejudiced by the admission of allegedly inadmissible evidence if the challenged evidence is merely cumulative to other evidence admitted without objection." *Sherrer*, 609 S.W.3d at 714 (quoting *Swartz v. Gale Webb Transp. Co.*, 215 S.W.3d 127, 134 (Mo. banc 2007)).

During Yoder's cross-examination, Yoder testified without objection that he was aware that Coon, Higgins, and other employees had lodged complaints concerning his management style, leadership, lack of professionalism, and the direction of Shuttlewagon and its product development. He specifically stated that Coon made a complaint before she resigned in 2017, and also twelve to eighteen months before her resignation, and that that complaint was investigated by management. Yoder testified that as a result of that investigation, he and other members of Shuttlewagon's management were disciplined, in that they had to give up their personal interests in the Royals suite, Yoder was prohibited from investing in outside companies without approval from Nordco, and he was

---

[20]Shuttlewagon's brief also complains that questioning was permitted into the following: (1) evidence that Yoder specifically "'leveraged' a personal Royals suite with a Shuttlewagon vendor"; (2) "evidence of 'practical jokes' by [Yoder] and others"; and (3) "'inferences' that an investigation had taken place pertaining to alleged harassment and discrimination of women employees . . . ." [Appellant's Brief, p. 32] The first and second of these complaints are not preserved for our review, as Shuttlewagon has not cited to any part of the record to confirm that either Griesbach or Boczkiewicz so testified, or that Shuttlewagon objected to questions that sought such testimony. The third complaint is not supported by Shuttlewagon's citation to the record, as Boczkiewicz testified that he was not aware of any complaints by women alleging the presence of a hostile workplace at Shuttlewagon.

"prevented from drinking at business events or lunches." Yoder explained that Nordco's concern during the investigation was that he and other Shuttlewagon managers were utilizing their Royals suite to leverage suppliers. Yoder's unopposed testimony is overwhelmingly cumulative of the deposition testimony of Griesbach and Boczkiewicz about which Shuttlewagon complains. As a result, the trial court did not err in admitting the complained of testimony from Griesbach and Boczkiewicz because the evidence was cumulative, and Shuttlewagon cannot prove it suffered prejudice from any ruling of the trial court. *See Ostermeier v. Prime Properties Investments Inc.*, 589 S.W.3d 1, 10 (Mo. App. W.D. 2019) ("[W]e 'will reverse only if the prejudice resulting from the improper admission of evidence is outcome-determinative.'") (quoting *Williams v. Trans States Airlines, Inc.,* 281 S.W.3d 854, 872 (Mo. App. E.D. 2009)).

Point Three is denied.

***Point Four: The trial court did not err in submitting instructions on the affirmative defense of mitigation of damages in connection with Shuttlewagon's unfair competition and computer tampering claims***

Shuttlewagon's fourth point on appeal argues that the trial court committed legal error when it instructed the jury on the affirmative defense of mitigation of damages in connection with Shuttlewagon's unfair competition and computer tampering claims because there is no legal authority for use of the instructions and because the instructions were not supported by substantial evidence. Specifically, Shuttlewagon asserts that the mitigation instructions were legally erroneous for three distinct reasons: (1) mitigation is not an affirmative defense to intentional torts; (2) substantial evidence established that the mitigation of revoking the Employee Defendants' log-in credentials immediately after

34

their employment ended would not have had an impact; and (3) the mitigation instructions required Shuttlewagon to engage in mitigation efforts before the completion of the alleged legal wrong. [Appellant's Brief, p. 36]

There are several issues with Shuttlewagon's point on appeal. First, Shuttlewagon's fourth point on appeal is impermissibly multifarious in violation of Rule 84.04(d)(1), as it sets forth three "distinct and separate reasons why the trial court's Judgment is allegedly in error." *Am. Civil Liberties Union of Mo. v. Ashcroft*, 577 S.W.3d 881, 888 n.8 (Mo. App. W.D. 2019) (citation omitted). "A multifarious point on appeal preserves nothing for appellate review." *Id.*

Second, Shuttlewagon's fourth point on appeal fails to comply with Rule 84.04(e) which requires that "[i]f a point relates to the giving, refusal or modification of an instruction, such instruction shall be set forth in full in the argument portion of the brief." "An appellant who asserts instructional error but does not set forth the instruction in question in the argument portion of his or her brief[] fails to preserve the issue for appeal." *Mitchem v. Gabbert*, 31 S.W.3d 538, 541 (Mo. App. S.D. 2000) (citation omitted). Shuttlewagon challenges two mitigation instructions, but has not set forth either instruction in its brief.

Third, though Shuttlewagon's point relied on challenges the mitigation instructions on three distinct bases, only one of these challenges was presented to the trial court. At trial, the only objection Shuttlewagon raised with respect to the mitigation instructions was that the Committee Comment to MAI 32.01 requires an affirmative defense to be "derived from either case law or statutory authority," and that IQS Defendants and

35

Employee Defendants had not cited to either to support that mitigation is an affirmative defense to unfair competition or computer tampering claims. As this was the only objection advanced by Shuttlewagon at trial, it is the only challenge to the instruction that can be raised on appeal. *McGuire v. Kenoma, LLC*, 375 S.W.3d 157, 174 (Mo. App. W.D. 2012) ("Where an alleged error relating to an instruction differs from the objections made to the trial court, the error may not be reviewed on appeal." (quoting *Goralnik v. United Fire & Cas. Co.*, 240 S.W.3d 203, 210 (Mo. App. E.D. 2007))).

As noted, however, even this challenge is subject to preservation concerns, given the multifarious nature of the fourth point relied on, and Shuttlewagon's failure to set forth the purportedly offending mitigation instructions in its brief. However, despite material preservation issues, we exercise our discretion *ex gratia* to consider the merits of Shuttlewagon's fourth point on appeal, but only with respect to the challenge that was preserved by a specific objection at trial.

We need not determine whether mitigation is legally available as an affirmative defense to unfair competition and computer tampering claims. The jury did not find liability in Shuttlewagon's favor on either claim, and thus never reached the mitigation instructions, which went solely to the issue of damages. "[T]he general rule" is that "the question of the correctness of . . . instructions on damages is immaterial" where "the jury returned a verdict for [defendants] and therefore the jury never reached the question of damages." *Sparks v. Ballenger*, 373 S.W.2d 955, 957 (Mo. 1964) (citing *Merritt v. Mantony*, 353 S.W.2d 768, 769 (Mo. 1962)). "[W]here evidence or argument is before the jury clearly bearing only upon the issue of the extent of plaintiff's damages, and the

36

jury's verdict demonstrates that the jury has failed to reach that issue, plaintiff is not prejudiced thereby." *Beesley v. Howe*, 478 S.W.2d 649, 653 (Mo. 1972) (quoting *Merritt*, 353 S.W.2d at 769). "Instructional error is not prejudicial if the jury never reaches the point in question." *Miller v. City of Kansas City*, 121 S.W.3d 313, 316 (Mo. App. W.D. 2003) (quoting *Bowls v. Scarborough,* 950 S.W.2d 691, 702 (Mo. App. W.D. 1997)).

Instructions 8 and 27, the mitigation of damages instructions, clearly provided that unless liability was determined in Shuttlewagon's favor on either the computer tampering or unfair competition claim, mitigation should not be considered. Instructions 8 and 27 clearly provided:

> [Instruction 8]: *If* you find in favor of [] Shuttlewagon on its claim for computer tampering against Defendants, *you must find that [] Shuttlewagon failed to mitigate damages if you believe* . . .

> [Instruction 27]: *If* you find in favor of [] Shuttlewagon on its claim for unfair competition against Defendants, *you must find that [] Shuttlewagon failed to mitigate damages if you believe* . . .

(Emphasis added.) Thus, the jury was expressly instructed that it could consider mitigation of damages if, and only if, it found in favor of Shuttlewagon on either the computer tampering or unfair competition claim. "In the absence of exceptional circumstances, appellate courts assume that a jury obeys a trial court's directions and follows its instructions." *Smith v. Kovac*, 927 S.W.2d 493, 498 (Mo. App. E.D. 1996) (citing *Barlow v. Thornhill*, 537 S.W.2d 412, 422 (Mo. banc 1976)).

Shuttlewagon relies on *Sterbenz v. Kansas City Power and Light Company*, 333 S.W.3d 1 (Mo. App. W.D. 2010) to assert that it is "plausible" that the jury found the

defendants liable, but reduced damages to zero dollars based upon the mitigation instructions, and then, "[i]n the absence of any damages, . . . ruled in favor of [d]efendants on liability." [Appellant's Brief, p. 50] However, this situation is not plausible, and *Sterbenz* is readily distinguishable.

*Sterbenz* involved Instruction 5, a verdict directing instruction[21] on a claim of trespass, that "included an affirmative defense tail" which "led the jury to Instruction No. 6 which instructed on an affirmative defense for failure to mitigate damages." *Id.* at 13-15. This Court reversed the trial court's judgment because we were unable to discern "whether the award was a result of the jury doing precisely what Instructions No. 5 and No. 6 ***combined to advise***, which was to not award damages which could have been avoided . . . ." even if the jury found liability in favor of the plaintiff. *Id.* at 16 (emphasis added).

Here, Instructions 7 and 26, the verdict directors for computer tampering and unfair competition, did not include an affirmative defense tail that directed the jury to consider mitigation as a part of its determination of liability. Moreover, the separate and distinct mitigation instructions were expressly conditioned on the jury first a finding liability in Shuttlewagon's favor. *Sterbenz* is of no assistance to Shuttlewagon. If the jury followed the instructions as directed, (which we are required to assume, in the absence of exceptional circumstances neither argued or demonstrated here), then it is not plausible that the jury entered a liability verdict in favor of the defendants on

---

[21]The Opinion discusses how Instruction No. 5 was truly a "verdict directing/damage" instruction that was also improper for other reasons. *Sterbenz*, 333 S.W.3d at 13-14.

38

Shuttlewagon's claims of computer tampering and unfair competition only because the jury believed that Shuttlewagon could have mitigated all of its damages.

Because the jury did not find liability in Shuttlewagon's favor on either the computer tampering or unfair competition claim, Shuttlewagon was not prejudiced by the submission of Instructions 8 and 27 as a matter of law. *Riley v. Union Pacific R.R.*, 904 S.W.2d 437, 444 (Mo. App. W.D. 1995) (holding that "an error regarding instructions is not prejudicial if the jury never reaches the point in question").

Point Four is denied.

## Conclusion

The trial court's denial of Shuttlewagon's motion for sanctions and the trial court's Judgment are affirmed.

_Cynthia L. Martin_
Cynthia L. Martin, Judge

All concur